VAN CISE v. MERCHANTS NATIONAL BANK.

1. STOCK IN CORPORATION—TRANSFER OF—PLEDGE.

Shares of stock in a corporation may be the subject of pledge by way of security for the performance of an obligation, by endorsement of the certificate of stock.

2. SAME.

To constitute a valid pledge of stock in a corporation as against a creditor of the pledgor, it is not essential that a transfer of the same to the pledgee should be made on the books of the corporation. Sec. 398, Civil Code, relates to a transfer of the legal title; and not to a transfer of an equitable lien or interest, by way of pledge.

3. PLEDGED STOCK—POSSESSION OF.

The fact that a certificate of stock sought to be pledged is in the hands of a trustee of the pledgor, with the knowledge and consent of both pledgor and pledgee, and with full knowledge of such pledge on the part of such trustee, is not such a lack of possession in the pledgee as could affect the validity of the pledge.

4. VALIDITY OF LIEN—AGAINST CREDITOR.

As against a creditor, attaching, or levying an execution on stock, with knowledge of a prior assignment of the equitable title by a transfer of the certificate, such equitable transfer will prevail; and the same rule prevails as to a pledge of such stock.

5. EXECUTION—LEVY—INTEREST OF PLEDGOR SUBJECT TO.

The equitable interest of a pledgor of stock may be the subject of levy and sale under an execution in this territory without actual seizure or manual possession of the certificate by the officer making the levy.

6. SAME—EXECUTION SALE—PASSES INTEREST OF PLEDGOR TO PURCHASER.

And a sale under an execution will pass to the purchaser at such sale the equitable interest of the pledgor in such stock.

7. EQUITIES—PURCHASER AT SALE—PLEDGEE.

As between the purchaser at an execution sale of the equitable interest of the pledgor of stock, and the holder of the equitable lien created by a pledge thereof—the equities being equal—the rights of the lien-holder, being prior in point of time, must prevail.

8. TRANSFER OF STOCK—AFTER LEVY.

After the levy of an execution on the equitable interest of the pledgor of stock, the holder of such stock as pledgee, having authority in writing from the pledgor to sell the stock and apply the proceeds on the indebtedness, cannot sell such stock to himself in any manner which would have the effect to change the legal status of the property, or any one's rights therein, so long as possession was retained by him.

9. SUFFICIENCY OF EVIDENCE—FINDING OF FACT—EXCEPTION TO—NOT
   REVIEWED WITHOUT.
       This court will not review findings of fact made by the trial court,
   nor inquire concerning the sufficiency of the evidence to support them,
   unless the exception to the finding is saved, and counsel point out
   wherein the evidence is insufficient.

Filed May 26, 1887.

Appeal from the district court of Lawrence county.

The trial court found among other findings of fact, that defendant, Alvin Fox, on October 6, 1885, purchased from Wm. H. O'Reilly the 4278 shares of stock, said purchase having been accomplished through a memorandum in writing executed by O'Reilly on Sept. 15, 1885, authorizing Fox to sell such stock and apply the proceeds on the indebtedness for which the stock was pledged. Said sale was made by Fox to himself after O'Reilly's death.

The remaining material facts are fully stated in the opinion.

*E. W. Martin* and *McLaughlin & Steele*, for defendants and appellants.

Shares of the stock of a corporation, were not subject to levy on execution and sale at common law. Angell & Ames on Corporation, Sec. 588; Freeman on Executions, Sec. 348, 262, a.; Ransom v. Miner, 1 Code Reporter, N. S. 98; Lee v. Citizens National Bank, 2 Cincinnati S. C. Reporter, 311; Denton v. Livingstone, 9 Johnson, 98; Howe v. Starkweather, 17 Mass. 243; Ingalls v. Lord, 1 Cowan, 240.

What property may be levied on. Code C. P. Sec. 314; Execution, Id. Sec. 317.

Levy—how made, and what is. Ray v. Harcourt, 19 Wendell, 495; Van Wyck v. Pine, 2 Hill, 666; Allen v. Calla, 25 Iowa, 464; Minturn v. Stryker, 1 Edmunds Select Cases, 356; Brown v. Pratt, 4 Wisconsin, 513; Linton v. Ford, 46 Penn. State, 294; Dresser v. Ainsworth, 9 Barbour, 619; Haggerty v. Wilber, 16 Johnson, 287.

That in this case no actual possession was taken, and the law has provided no method of making a constructive levy.

Where provision is made for attaching shares of stock in a

corporation, it will not authorize levying upon the same on execution.   Lyon v. Coburn, 1 Cush. 278;  Van Norman v. Jackson, 45 Mich. 204;  Foster v. Potter, 37 Mo. 525.

Shares of stock may be pledged.   Civil Code, Sec. 413.

A pledge in possession of the pledgee cannot be levied upon.   Drake on Attachment, Sec. 245, 539;  Freeman on Executions, Sec. 348,  Story on Bailments, Sec. 353;  Jones on Pledges, Sec. 372;  Badlam v. Tucker, 1 Pickering, 399;  Pomeroy v. Smith, 17 Pickering, 86;  Stieff v. Hart, 1 New York, 22;  Hogan v. Lucas, 10 Peters, 405;  Holbrook v. Baker, 17 American Decisions, 236;  Haven v. Low, 9 American Decisions, 276;  Moore v. Murdock, 26 California, 525;  Smith v. American Coal Co., 7 Lansing, 319; Tunnahill v. Tuttle, 3 Michigan, 110; Harris v. Murray, 28 New York, 574;  Hill v. Charnley, 11 New York, 507;  Seymour v. Newton, 17 Hun. 32;  Srodes v. Caven, 3 Watts, 258.

No offer to redeem is pleaded.   Drake on Attachment, Sec. 539;  Hall v. Page, 48 American Dec. 235;  Hepp v. Glover, 35 American Dec. 2 9;  Yeatman v. Savings Bank, 95 U. S. 766;  Galveston R. Co. v. Cowdry, 11 Wallace, 477.

Shares of the capital stock of a corporation may be pledged, and an unregistered transfer thereof is good, a delivery of the certificate properly endorsed, passes at least the equitable title to the shares, and such equitable title will prevail over a subsequent levy upon attachment or execution.   Jones on Pledges, Secs. 151, 152, 168, 169, 170, 171, 174, 179, 180, 219, 220; Weston v. Bar River Co. 6 California, 425;  People v. Elmore, 35 California, 655;  Thompson v. Toland, 48 California, 113;  Winter v. Belmont Mining Co., 53 Cal. 430;  Farmers Nat. Gold Bank v. Wilson, 58 California, 603;  Rogers v. Stevens, 8 N. J. Equity, 170;  Broadway Bank v. McElrath, 13 N. J. Equity, 24;  Turnpike Co. v. Ferrce, 17 N. J. Equity, 118;  Prall v. Tilt, 28 N. J. Equity, 483;  Dickinson v. Central Nat. Bank, 129 Massachusetts, 283;  Boston Music Hall v. Corey, 129 Massachusetts, 435;  National Bank v. Dearborn, 115 Massachusetts, 219;  Nat. Bank v. Bayley, 115 Massachusetts, 229;  Sibley v. Quinsigamond Nat. Bank, 133 Massachusetts, 521;  Sargent v. Franklin Ins.

Co., 8 Pickering, 90; Sargent *et al.* v. Railway Corporations, 9 Pickering, 201: Plymouth Bank v. Bank of Norfolk, 10 Pickering, 454; Bridgeport Bank v. Railroad Co., 30 Connecticut, 231, 270; Colt v. Ives, 31 Connecticut, 25; Mandelbaum v. Mining Co., 4 Michigan, 465; Newberry v. Detroit & L. S. Iron Co., 17 Michigan, 140.

The certificate, No. 1216, was placed in the pool by appellant, Fox, and the trustees of the pool held it as bailees or pledgeholders for the pledgees. Jones v. Baldwin, 12 Pickering, 318; Jones on pledges, Sec. 34–35; Macomber v. Parmer, 14 Pickering, 497; Hearn v. Roup, 8 Iowa, 209; Whitney v. Tibbitts, 17 Wis. 359.

It is not necessary to the validity of a pledge, that there be an actual continued personal possession by the pledgee of the pledge. Story on Bailments, Sec. 297–299; Tyler Usury and Pledges, pp. 517–520–681–682–696; White v. Platt, 5 Denie, 269; Clark v; Isclin, 21 Wallace, 368.

That by proceedings upon attachment, the purchaser at such sale acquires only such rights as the defendant had in such shares of stock. Code of Civil Procedure, Sec. 210, subdiv. 2; Drake on Attachment, Sec. 245; Osterman v. Baldwin, 6 Wallace, 122; McLouth, v. Rathborne, 19 Ohio, 25; Kingman v. Perkins, 105 Mass. 111; Thayer v. Daniels, 113 Mass. 129.

The only right of O'Reilly, in and to the shares of stock and the certificate, was a right to redeem.

It is respectfully submitted: that the court erred in so treating the action, there was no offer to redeem, and the complaint will not sustain the judgment.

*Van Cise & Wilson, Hamilton & Rice,* and *W. C. Kingsley,* for respondents.

No briefs furnished.

PALMER, J. The Iron Hill Mining Company was a corporation, duly organized under the laws of the Territory of Dakota. The Merchants National Bank of Deadwood, Dakota, was a corporation, likewise organized under the laws of the United States, and Alvin Fox was its cashier. Stebbins, Mund, and Alvin Fox were co-partners, and located at Central City, Dakota.

This action was originally instituted against one William H. O'Reilly and the defendants above named; before judgment was obtained, William H. O'Reilly deceased, and Edward Reilly was substituted as administrator.

September 30, 1885, one Martin W. McDonnell recovered judgment against the defendant, William H. O'Reilly, for the sum of $2,226.50. On the 5th day of October, 1885, an execution was issued on said judgment ond delivered to the sheriff of said Lawrence county, who on the 6th day of October, 1885, levied the same upon 4278 shares of the capital stock of the Iron Hill Mining Company, defendant, for which a certificate had been issued to decedent O'Reilly. The levy was made by leaving a certified copy of the execution with D. A. McPherson, secietary of the Iron Hill Mining Co., with a notice showing the property levied upon; whereupon the said McPherson furnished a certificate as such secretary, stating that certificate No. 1216 for 4278 shares stood registered on the stock book of said company in the name of W. H. Reilly, (who was the same person as decedent William H. O'Reilly). On the same day a copy of the execution was served upon the judgment debtor, William H. O'Reilly, together with a notice thereon of the property levied upon under the execution. At this time said certificate No 1216, was in the hands of defendant Fox, as a part of certain "pool stock"; as soon as this fact became known to the judgment creditor, and in the afternoon of October 6, 1885, the sheriff served a copy of said execution on said Cashier Fox, with the following endorsement thereon: "To Alvin Fox, take notice, that under and by virtue of an execution now in my hands and of which I certify that the within is a true copy, I have levies upon the following described personal property now in your hands, as the property of the within named defendant, William H. O'Reilly, to-wit: Four thousand two hundred and seventy-eight shares of the stock of the Iron Hill Mining Co., Deadwood, D. T., October 6, 1885. JAMES W. GARLAND, sheriff.

At the time the above notice was served upon Fox, he notified the sheriff that the bank claimed a lien upon the stock, for

indebtedness due it from O'Reilly. This information was on the same day communicated to the attorney for the execution creditor, and on the 9th day of October, this plaintiff was informed of said claim by the bank.

The sheriff proceeded to advertise the property, and in pursuance of the execution and levy aforesaid, he on the 4th day of November, 1885, at the front door of the court house in Deadwood sold the same to this plaintiff, (he being the highest bidder,) for the sum of $2,266.34, that amount satisfying the exertion.

The sheriff did not have the certificate of stock in sight at the time of the sale, and in fact never had it in his manual possession.

The purchase was made in the name of the plaintiff in trust for the execution creditor, Martin W. McDonnell, subject to certain conditions, unnecessary here to mention. At the time and before the stock was sold by the sheriff, Fox protested against the sale, and gave public notice that the Merchants National Bank, the firm of Stebbins, Mund, & Fox, and himself, had a claim or lien upon the stock.

The stock was sold and a certificate or bill of sale was executed by the sheriff to this plaintiff. Whereupon, on the 5th day of November, 1885, the plaintiff took his certificate of sale, to said D. A. McPherson, secretary of the Iron Hill Mining Co. at his office, read the same to him, and there demanded of him that he make to the plaintiff upon the books of the corporation the proper transfer of the said 4278 shares of stock so sold, etc. And that he issue a new certificate to this plaintiff for said stock, and cancel that standing in the name of Reilly. This, McPherson refused to do, giving as his reasons, that he had learned that cashier Fox claimed a lien on the stock, and held said certificate No. 1216 as collateral security, etc.

The foregoing is sufficient to show the proceedings under and by virtue of the execution.

It will be remembered that the judgment was rendered September 30, execution issued October 5th, levied October 6th, sale on execution November 4th, all in the year 1885; that on

the 5th day of November, 1885, demand and refusal was made, to transfer the stock upon the books of the corporation to the plaintiff herein, because the secretary, McPherson, had been informed that the defendant bank had some claim upon it, and held the certificate representing the stock in some manner as collateral security.

It becomes important, then, to know how this property was in fact held by the defendant bank; the respondent insists it was pledged.

The 4278 shares of stock in controversy, seem to have been in the possession of Stebbins, Mund & Fox, or the bank, either for safe keeping, or otherwise, since April, 1883. But it is unnecessary for our purpose here to determine the character of the holding prior to the 19th of May, 1885, at which time the old certificate (No 372) representing this stock, was surrendered, and certificate No. 1216, was issued, which was the certificate outstanding at the time the sheriff made the levy.

On April 13, 1885, the "pool stock" contract was entered into, whereby certain stockholders of Iron Hill stock agreed to each endorse and deposit a quantity of said stock with trustees, naming them; said Alvin Fox being one. These trustees were clothed with certain powers concerning the management of the stock, which we need not stop to consider. This pool contract was to go into effect July 6, 1885. This contract was signed by defendant Fox and the other trustees named therein, by the decedent William H. O'Reilly, and other stockholders; and by virtue of another portion of said contract, when the stock was all thus "pooled". the trustees were to make a list of the same, securely enclose and seal up said stock, and deposit the same in the vault of the Merchants National Bank of Deadwood.

The portion of stock thus pooled by the decedent William H. O'Reilly was 4278 shares (the stock here in controversy,) and on the 19th day of May, 1885, the decedent O'Reilly endorsed his name upon the back of his certificate No 1216, at the request of Fox, and the same was then wrapped or sealed, and deposited as above set forth; at which time, by verbal agree-

ment between said Fox and O'Reilly, said certificate No. 1216, was to be held as collateral security for said O'Reilly's indebtedness to said Stebbins, Mund & Fox and the Merchants National Bank of Deadwood.

On the 15th day of August, 1885, the amount of individual indebtedness, exclusive of assessments paid for the decedent O'Reilly by the Merchants National Bank, and the firm of Stebbins, Mund & Fox, was figured up with interest and found to amount to $1,665.40. Whereupon the whole amount was taken by the bank at Central City, and the decedent Reilly gave his note therefor, in words and figures following to-wit:

$1,665.40.                    Deadwood, Dakota, August, 15, 1885.

30 days after date for value received I promise to pay to F. M. Clary, cash or order, sixteen hundred sixty-five and 40-100 dollars at the Merchants National Bank at Deadwood, Dakota, with interest at the rate of 2 per cent per mo. · until paid, having deposited with him as collateral security 4278 shares of Iron Hill and segregated stock, in pool at Mchts. Nat. Bank, Deadwood, D. T., which I hereby authorize him to sell at public or private sale, or otherwise, without notice, on the non-performance of this promise and also authorize him to use, transfer or hypothecate the same at his option; he being required on payment of the amount loaned as herein specified, at any time before said collateral security shall have been sold, to surrender the same.                    W. H. O'REILLY.

On the 15th day of September, 1885, the decedent O'Reilly made and delivered to the defendant Fox the following memorandum in writing:

"Central City, D. T., September 15, 1885. Mr. A. Fox, Cash. I hereby instruct you to sell for my ac. and credit on indebtedness to yourselves and Central Bank a part or all of my Iron Hill mining stock at best figures obtainable, said stock now being held in the Iron Hill pool, of which you are trustee.
                    W. H. O'REILLY."

Upon the question of transfer of the shares of stock upon the books of the company, the court finds as follows:

"No transfer of the 4278 shares of stock of the Iron Hill Mining Company standing in the name of W. H. Reilly and belonging to the decedent O'Reilly, and for which certificate 1216 was issued, as before stated, has ever been made on the stock and transfer book of the Iron Hill Mining Company, and no transfer was ever demanded by the defendant Fox, or any one on his behalf, until about two months after the demand was made by the plaintiff in this action, as hereinbefore stated.

"The by-laws of the Iron Hill Mining Company provide that shares of stock in the company may be transferred at any time by the holders thereof or by attorney legally constituted, or by their representatives. The transfer shall be made by endorsement upon the certificate of stock and surrender of the same to the secretary of the company, provided that such tranfer shall not be valid except between the parties thereto until the same shall have been noted in the proper form on the books of the company.

"Certificate No 1216 heretofore alluded to, was in the words and figures following, to-wit:

"Capital Stock,        Incorporated under the        250,000 shares,
    $2,500,000.              Laws of Dakota.              $10.00 each.

### THE IRON HILL MINING COMPANY.

No. 1216.    4,278 Shares.

This certifies that W. H. Reilly is entitled to 4,278 shares capital stock of the Iron Hill Mining Company, transferable only on the books of the company by endorsement hereon and surrender of this certificate. Witness the corporate seal of said company and signatures of the president and secretary at Deadwood, Dakota, this 19th day of May, 1885.

SETH BULLOCK, President.

D. A. McPHERSON, Secretary.

[Seal.]                              [Endorsed W. H. O'Reilly."]

July 12, 1886, the plaintiff gave notice to the trustees of the Iron Hill pool, that he was the owner of the stock in question and demanded delivery of the same. July 12, 1886, the pool

contract terminated.    The certificates were distributed with the exception of certificate No. 1216, which was placed in an envelope, sealed and placed in the custody of the Merchants National Bank of Deadwood, in trust, subject to the order of the trustees upon final decision of the courts.

From the foregoing statement it will appear that the serious questions in this case are first:    Was the transaction such that the relation of pledgor and pledgee was established between O'Reilly and Fox, as to the stock in question?    And second, was there a valid levy and sale under the execution?

The provisions of our code upon the subject of pledge are as follows, Sections 1757, 1758, 1759, 1764 of the Civil Code:

"Pledge is a deposit of personal property by way of security for the performance of another act."

"Every contract by which the possession of personal property is transferred, as a security only, is to be deemed a pledge."

"The lien of a pledge is dependent on possession, and no pledge is valid until the property pledged is delivered to the pledgee, or to a pledge-holder, as hereafter prescribed."

"A pledgor and pledgee may agree upon a third person with whom to deposit the property pledged who, if he accepts the deposit, is called a pledge-holder."

From the above provisions it will not be difficult to determine what class of property may be the subject of pledge; what interest passes to the pledgee in the property pledged; and, so far as the pledgor is concerned where the possession of the property pledged must be.

The shares of stock in controversy here were personal property, subject to a valid transfer as between vendor and vendee by endorsement and delivery of the certificate.    Sec. 398, Civil Code.

It is however further insisted by counsel for the plaintiff, that the further provision of this section is conclusive of the rights of the parties here.    It is as follows: "But such transfer is not valid, except between the parties thereto, until the same is so entered upon the books of the corporation, etc."

In attempting to construe this provision of our law, it must

be borne in mind what the transferable interest is which this section contemplates,—clearly a legal title, not an equitable lien.

That the legal title to this stock was not conveyed to Fox by O'Reilly from what appears in this case, may be conceded, and the important question still remains was an equitable interest conveyed. Whether we look at the acts of the parties or their words, or study them both together, we fail to find any evidence warranting the conclusion that there was a sale, or a valid attempted sale, of this stock, or transfer of the legal title by William H. O'Reilly to the defendant Fox.

Transfer, under our code, is an act of the parties or of law by which the title to property is conveyed from one living person to another. Sec. 599, Civil Code.

A transfer may be made without writing in every case in which a writing is not expressly required by statute. Section 604, Civil Code.

A transfer rests in the transferee all the actual title to the thing transferred which the transferrer then has, unless a different intention is expressed or necessarily implied. Section 619, Civil Code.

But a transfer of stock of the character in question, is not valid, except between the parties thereto until the same is so entered upon the books of the corporation, as to show the names of the parties by and to whom transferred, the number or designation of the shares, and the date of the transfer. Section 398, Civil Code.

Concluding, as we then must, that the transaction in question did not constitute a transfer of the legal title, did it convey to Fox an equitable title which could be secured by way of pledge? It is not seriously contended by counsel for plaintiff here, nor do we think it well can be, that this class of property cannot be pledged in some manner. In defining the powers and fixing the liability of stockholders and others dealing with them in bodies corporate, our Civil Code, Sec. 413, provides: "Stock held as collateral security, or by a trustee, or in any other representative capacity, does not make the holder thereof

a stockholder within the meaning of this section, except in the cases above mentioned, so as to charge him with any proportion of the debts or liabilities of the corporation, but the pledgor or per-person or estate represented, is to be deemed the stockholder as respects such liabilities etc.    And independent of the statute, it is not easy to give a reason why this class of personal property should be placed upon the "black list" when considered from the standpoint of a pledge.    But it is strenuously insisted that it was impossible for this stock to be in pledge, because first, the stock was not in the possession of the pledgee, but rather in the possession of the trustees of the "pool;" second, as to third parties no valid binding pledge could be made short of a transfer of the stock upon the books of the company.

At a glance, the first objection would seem to be extremely technical, and hardly entitled to serious attention.    The court finds that certificate No. 1216 was endorsed by O'Reilly while in Fox's possession; and by Fox placed in the hands of the trustees of the stock pool, he himself being the first trustee named; and this certificate then placed with the others in an envelope, sealed and deposited with the Merchants National Bank at Deadwood, of which bank Fox was himself cashier. It would, however, be unprofitable as it is unnecessary to at-tempt to draw the line just where the possession of. Fox, the cashier, would end, and the possession of the same Fox as chairman of the board of pool trustees would begin.

It is very clear that whatever was done with certificate No. 1216 previous to the levy of execution, was with the full knowl-edge and consent of O'Reilly.

Nearly two months before the levy of execution the indebt-edness from O'Reilly to Stebbins, Mund & Fox was figured up, and including assessments paid to August 17, 1885, amounted to more than twenty-four hundred dollars.    No question is made as to the *bona fides* of this indebtedness, but it is insisted that the lien which Fox had (if he had any) previous to the organiza-tion of the pool, was a personal privilege, and could not be trans-ferred or changed, by placing the pledge in the pool as was done in this case.    But to our mind this is limiting the rights

and powers of a pledgee to a sphere much too narrow to fit the position, which, under the adjuicated cases, he is permitted to occupy.    And we are unable to see any good reason why with the consent of O'Reilly Fox might not have placed the pledged stock in the hands of trustees, agents or bailees so long as the possession, actual or constructive, was retained in Fox.

No act of Fox with O'Reilly seems to have been unjust or oppressive, but the transaction is attacked by a creditor of O'Reilly's, who insists that the pledgee by his acts has forfeited his legal and equitable claim to the property in question.

Such conclusions would only be justified upon the hypothesis that any act, even with the consent of the pledgor, which lost to the pledgee, temporarily or otherwise, the actual manual possession of the property pledged, would operate to forfeit his equitable lien or title to the same.    A proposition not warranted.

Says Mr. Justice SARGENT, in Brown v. Warren, 43 N. H. 430:   ''It can make no difference if the property is not in the hands of the pledgor, whether it be in the hands of the pledgee or of a third person who has known and assented to the pledge, and who thus holds the property for the pledgee; nor can it be material that the property be held by one alone, or by two jointly, as in this case, provided they both assent to hold the property for the pledgee; and they could as well and as properly thus jointly hold the property for one of their own number who was the pledgee as for a stranger.''

Macumber v. Parker, 14 Pick. 497, is a much stronger case than Brown v. Warren or the case at bar.    There Evans, the pledgor, was permitted to exercise control over and sell from the property in pledge.    And the court held it competent to show what his relation was to the assignees of the pledgee, and in the absense of fraud it appearing that he was handling the property only as agent for the assignees of the pledgee, it was held no interruption of possession of the pledgee's assigns. See Story on Bailments, 8th Ed. Sec. 299; Casey v. Cavarock, 96 U. S. 467.

v.4DAK.—32

Did, then, the validity of the pledge depend upon the recording of the transfer upon the books, of the stock pledged?

While there seems to be a great conflict of opinion upon the question whether an unregistered transfer passes the legal, as well as the equitable, title to corporate stock,—especially in the absence of any statute or by-law of the corporation, yet it seems very clear that the case at bar presents no such question for our consideration.

If it is clear from the authorities that the transaction in this case passed the equitable title, then its effect upon the legal title is not important; for as against creditors attaching stock with knowledge of a prior assignment of the equitable title by a transfer of the certificate, there is no doubt that such equitable transfer will prevail.

Says Mr. Justice STORY in Black *et al.* v. Zachery & Co., 3 How. 531: ''The question is not here whether the legal interest in the stock passed by the assignment, before a transfer of the stock upon the books of the corporation; but whether the equitable interest therein as contra-distinguished from the legal interest did not pass to and vest in the assignee by the law of Louisiana so as to oust the right of any creditor with full notice of the assignment, from divesting the title of the assignees by a subsequent attachment thereof as the property of the debtor. *    *    *    *    *

In respect to the gas light and banking company the interest in the stock had been transferred to the Bank of South Carolina as a pledge; and the letter of attorney was given to perfect the equitable into a legal title by actual transfer upon the books of the corporation; but, subject to that pledge, the equity was with the consent of the Bank of South Carolina vested in the assignee under the assignment; so that each case presented the same general question as to the validity of the equitable title by the law of Louisiana, against attaching creditors having full knowledge of the equity. Out of Louisiana we believe that no such question could possibly arise, for courts of law as well as courts of equity, are constantly, in all states where the common law prevails, in the habit of holding a prior

assignment of the equitable interest in stock as superceding the right of attaching creditors who attach the same with the full knowledge of the assignment."

And such seems to be the settled rule concerning this class of securities when held in pledge.

The court below found that at the time the levy of the execution was attempted (October 6, 1885,) the execution creditor was informed that the stock he was seeking for was in the pool and in the possession of the defendant Fox; and the officer attempting to levy the execution by serving copy upon Fox, was informed of the nature of the claim of Stebbins, Mund & Fox upon the stock, and McPherson, the secretary of the corporation was, about the time of the execution sale, fully advised of the claim of Fox upon the stock in question.

Assuming the levy and sale to be valid, then the question is presented what interest did William H. O'Reilly have in the property that would be subject to sale on the fourth day of November, 1885? In determining that question it may be well to inquire what rights or powers did he at that time possess over the stock? Could he invoke any legal power to regain possession of it without first meeting the charges against it? Clearly not. Could he by gift assignment or transfer upon the books, or in any other manner dispose of it, so as to defeat the lien held by Fox? Most certainly not, after the company had notice from Fox of his possession and lien.

So it seems clear, if other rights had so far intervened and become so firmly affixed to the identical property (the shares of stock) that O'Reilly could no longer shape and direct its destiny, then the invisible but legal boundary had been passed, beyond which the creditors of O'Reilly could not go in quest of the thing itself. The certificates of stock as such were beyond the reach of the officer and his execution; and this brings us to the only important question remaintng, viz. was there a valid levy? If so, what property or interest of O'Reilly's was reached by the process?

To the last inquiry common justice would answer, all such, and only such, interest as remained in the pledgor. As we

have seen the legal title remains in the pledgor; the right of redemption attaches to the pledge; that interest remained in O'Reilly, and was possessed by him at the time of the execution levy. Was that interest reached by the levy of the execution and sold thereunder?

It is strenuously insisted by counsel for defendants, that no levy and sale of this class of property is valid without actual manual possession of the property by the officer conducting the sale; and especially as the property was in pledge and no redemption or offer of redemption had been made by the attaching creditor. If these propositions are tenable it will prove a solution and determination of this case.

The pledgee by virtue of the pledge acquired a special property in the shares of stock, and until the full amount had been paid for which the pledge was given, the pledgee was not bound to deliver the certificates either to the pledgor, attaching creditor, or any other person. Yertman v. Saving Institution, 5 Otto 764.

Hence it becomes important to inquire whether under the law of the territory a valid levy could have been made upon any interest of the pledgors short of the thing *in esse*—the shares of stock.

Section three hundred and fourteen of the Code of Civil Procedure provides: "All goods, chattels, moneys and other property, both real and personal, or any interest therein, of the judgment debtor not exempt by law * * * are liable to execution; shares and interest in any corporation or company, and debts and credits and all other property, both real and personal or any interest in real or personal property, and all other property not capable of manual delivery, shall be liable to be taken on execution and sold as hereafter provided."

Section 210 of the Code of Civil Procedure in providing the manner of satisfying judgments out of the proceeds of execution sales upon property attached, provides: " * * * * and in the case of the sale of any right or shares in the stock of a corporation or association, the sheriff shall execute to the purchaser a certificate of sale thereof, and the purchaser shall

thereupon have all the rights and privileges in respect thereto which were had by such defendant."

Section 338 Code Civil Procedure in providing the manner of sale under execution provides: " * * * When the sale is of personal property capable of manual delivery it must be within view of those who attend the sale. * * * "

These provisions of the code are examined for the purpose only of determining: *First*, whether they warrant a levy upon intangible property, as in this case; and, if so, whether power is conferred to effect a valid sale of such an interest in personal property without actual possession by the officer.

From a careful consideration of the statute and authorities we think both propositions must be answered in the affirmative. Our attention has not been directed to the statutes of any state whose provisions for reaching after all kinds of (non-exempt) property by means of execution levy and sale, are broader or more far reaching than those of this territory. With the undoubted authority and power to reach, hold and sell this class of property by the attachment process—and the manifest purpose of the legislature to require such interests as are here involved, liable to respond to the law's demands upon execution, sale, we feel no "hide-bound" construction of the various provisions of our code is demanded; and to our minds such would be the construction, if it was determined that this great and valuable interest in personal property could not be reached, because the legislature had failed to provide the machinery for paying off the pledgee's claim, and taking possession of the pledge itself by the officer. It may be noticed in passing that we are not now attempting to explain how the pledge itself may be taken upon execution by the officer, but rather the interest in personal property not capable of manual delivery, referred to in Section 314, Code of Civil Procedure.

This view of the subject renders it unnecessary to consider at all the question discussed by counsel, whether the certificate "was the thing, or a representative of the thing, of value." Much difficulty has been experienced and some conflict of authority has arisen in the attempt to adjust the procedure to the

rights of partners, joint tenants, tennents in common, mortgagor and mortgagee, pledgor and pledgee, when the interest of one of the parties was sought after by an execution creditor; yet some of the questions may be considered settled by the authorities; and that under statutes like our own no authority or power is vested in the officer to disturb the pledgee's possession of the pledge, while the debt for which the pledge was given remains unpaid. That the intangible interest of the pledgor in property of this character was intended to be subject to execution. That no interest in the property pledged could be sold or disturbed, except such as the pledgor had at the time of the levy; and that such interest may be conveyed by execution sale to a purchaser at such sale. And as GARDINER, J., well says in Stief v. Hart, 1 Comstock, 35: "The rights of the pledgee are as important as those of the judgment creditor; they are also prior in point of time; both should be respected and such construction should be given to the statute as will enable the creditor to reach the interest of the pledgor without essentially impairing the right of the pledgee under his contract."

The supreme court of Wisconsin seems to have been frequently asked to pass upon this question, and have uniformly held that while the pledgee's possession of the property could not be disturbed by an execution creditor, still the pledgor's interest might be levied upon and sold under execution." See Hass v. Prescott, 38 Wis. 146; Saxton v. Williams, 15 Wis. 320. And while the California cases cited by the defendant's counsel all refer to levy and sale of intangible interests in real estate, still the same general principle is recognized.

Without attempting then to repeat here the proceedings of the officer and judgment creditor, from the time of the rendition of the judgment to the commencement of this action, we think there was a valid sale under the execution of William H. O'Reilly's interest in the 4,278 shares of stock held in pledge by the defendants, viz: his right of redemption. That the levy and sale in no way disturbs the right of possession, nor the title such as it was, then held by the pledgees. The pertinent question then is, with a valid, undisturbed pledge as the property

of the defendants, and the valid levy and sale upon execution, of the pledgor's interest in the pledge, as the property of the plaintiffs, what are the relative rights of the parties here? The plaintiff with his equitable right acquired by virtue of the execution sale, and the defendant with his equitable right or title obtained by virtue of the pledge.

The plaintiff strenuously insists that no legal title to the shares of stock has passed to the defendants, because, no transfer had been made to them upon the books of the corporation. Thus confessedly admitting no legal title in himself, because he is here praying this court to decree to him the performance of that very act, which he claims is the prerequisite to all legal title,—a transfer upon the books.

A race between equities is thus instituted which may be settled by applying the maxim in equity that, "between equal equities priority of time will prevail."

This rule is invoked to determine the order between conflicting equities, and is frequently applied to questions which arise under titles acquired through equitable assignments, and unless prevented by some other legal objection, must be conclusive of the rights of the parties here.

The case, *In re* Murphy, 51 Wis. 519, was a contest over the legal title between one Eldred who took a common law assignment of one share of the capital stock of the Janesville Cotton Manufacturing Co., but before he had presented it to the company for transfer upon the books of the company, Murphy had levied his execution upon it, against Doyle, the assignor of Eldred. The execution creditor had no knowledge that the legal title had been conveyed or attempted to be conveyed at the time of the levy, and that court keeping themselves in line with Maine and California hold, that such assignment of stock, without being transferred upon the books of the company would not pass the legal title to the same as against attaching or execution creditors of the assignor without notice of such attempted transfer.

To the same effect is Sabin v. Bank of Woodstock, 21 Vt. 353, cited by counsel for plaintiff. The case of Perrin v. Reed,

35 Vt. 2, cited by same counsel, presented questions relating to attempted levies and sales of real estate and the conflicting rights of the parties there were effected by the law regulating the recording of deeds of transfer.

And the California cases also cited by plaintiff arose from the attempt to reach by levy of execution intangible interests in real estate; and, while some courts under different statutes have made or attempted to make distinction between the two classes of cases, still the general principal is enunciated by the Calfornia courts that was held *In re* Murphy, *ante.*

And as we view the nature of the transaction in the case at bar no necessity exists for us to attempt to question the soundness of the doctrine of those cases, even if we were inclined to do so; which certainly is not the case.

The levy being valid it necessarily follows that the attempted sale by Fox to himself, of the shares of stock in controversy, and after a copy of the execution had been served upon him, was a vain proceeding, O'Reilly's equity in the stock was (so far as Fox was concerned) in *custodia legis* from that time; and, no "presto change" proceeding by Fox with himself could have the effect to change the legal status of the property or of any one's rights therein so long as the possession was still retained by him.    Was the admission of Fox's testimony error?

The defendant was put upon the witness stand in his own behalf, and was asked concerning an agreement between himself as the representative of the firm of Stebbins, Mund & Fox, and the Merchants National Bank of Deadwood, and the decedent William H. O'Reilly concerning the possession of, and pledging of the stock as found by the court below.    Counsel for plaintiff objected to this testimony; the objection was overruled and the evidence admitted.    Counsel for plaintiff insists this was error and the evidence should have been excluded be-cause prohibited by Subdivision 2, Section 446, Code of Civil Procedure.

It is insisted in reply that this question is not before the court for review, because no motion was made to correct the

findings, made by the court; no objections to the findings was taken, and no motion made for a new trial. Concerning the question of practice here raised, some if not all of them were presented in the case of James K. Nichols v. Henry A. Bruns *et al.*, argued at this term of court, and we leave to that case to establish and settle the practice so far as they are identical, only saying, that this court will not review the findings of fact made by the trial court nor inquire concerning the sufficiency of the evidence to support them, unless the exception to the finding is saved, and counsel "point out" wherein the evidence is insufficient.

As to the question here presented we think the defendant Fox did not occupy the "party relation contemplated by the statute and was not therefore disqualified as a witness. National Bank v. Jacobus, 109 U. S. 275.

So far as the contempt and stay proceedings are concerned —there seems from the record to be a very good reason why, under the circumstances, the defendant should not have been held in contempt of the court's order; no copy of the judgment had been served upon Fox as required by law; and this reveals somewhat the true condition of affairs and manner of conducting proceedings in our over worked courts. The technical omission of the plaintiff in omitting to serve a copy of the judgment, furnished an avenue of escape for Fox from liability for a technical contempt. The same with reference to the order or want of an order staying proceedings; with courts overwhelmed with work and attorneys anxious to grasp and dispose of cases grown grey upon the calendar, there is a disposition among lawyers (and the judges as well) to take much for granted. While the vice of such a practice may at times appear and shock the more sensitive and well balanced legal mind, still it may be considered one of those "legal necessities" peculiar to our present judicial condition, and in this case these questions presented by these two assignments of error were matters largely in the hands of the trial court, subject to his control and discretion; and we are unable to see any abuse of that discretion.

Application was made to the court on the 6th day of September to fix the amount of the supersedeas bond; this amount was not fixed, however, till the 8th day of September, when the stay was granted, amount of bond fixed, and amended judgment rendered.

It may be that the court with the whole case there in his hand, orders, decrees, motions, and judgments, waived some of the strict statutory requirements and presumed some things to have been done, which as a technical fact were not performed. The courts are compelled to do that, and before the jurisdictional control of the case is lost to'the court, he may do a great many things with his records, orders and judgments. 31 N. W. Rep. 847. See Territory v. Christensen.

We see no error in this branch of the case and the judgment must be affirmed. All the justices concurring.