Hon. THOMAS, C. BACH, ⎫
Hon. STEPHEN DE WOLFE, ⎬ Associate Justices.
Hon. MOSES J. LIDDELL, ⎭

## TERRITORY OF MONTANA, RESPONDENT, v. CHARLES CLAYTON, APPELLANT.

CRIMINAL PRACTICE— *Grand juror.*—The defendant challenged a member of the grand jury, on the ground that he was not a citizen of the United States. The juror had taken out his first papers for citizenship only. The court refused to sustain the challenge; and, after some of the testimony had been heard by the grand jury, but before that body had finally considered defendant's case and presented an indictment therein, admitted the juror to full citizenship. *Held,* that under the rule as laid down in *Territory* v. *Hart,* 7 Mont. 489, the juror was competent.

SAME— *Failure to challenge grand juror.*—A member of the grand jury had been regularly drawn, but by mistake, the sheriff summoned another person in his stead, who appeared in court and was excused. The juror being brought into court by an attachment, was duly impaneled, and served upon the jury. The defendant failed to challenge him. *Held,* that while it was doubtful whether a challenge could have been sustained to the panel of the grand jury under section 119, division 3, Compiled Statutes, that the defendant by his failure to interpose a challenge waived any right that he might have had thereto, upon the authority of *Territory* v. *Harding,* 6 Mont. 324.

*Same—Immaterial error.*—A witness was put upon the stand, in behalf of the prosecution, who testified favorably to the defendant. The prosecution was then permitted to examine a member of the grand jury, in order to impeach the witness by proving that he had made a different statement before the grand jury. The testimony of the grand juror, however, did not contradict that of the witness. *Held,* that if there was error in allowing the examination of the juror, no harm resulted to the defendant.

CRIMINAL EVIDENCE—*Res gestæ.*—The defendant testified that after shooting the deceased, he had remained at the place some time, had then ridden to the home of the deceased and notified the family of the shooting, and after that, being on his way to surrender himself to the sheriff, had met a justice of the peace to whom he had given up a gun. Upon being asked by his counsel what he said to the justice when he handed him the gun, an objection was interposed and sustained. *Held,* that what the defendant may have said to the justice was no part of the *res gestæ* of the shooting.

SAME—*Opinion of witness.*—A witness for the Territory had testified that, so far as he knew, the deceased had no pistol on him at the time of the shooting, and was asked by the prosecution, "If he had had one, do you think you would have seen it." *Held,* that the question was competent.

AMENDMENT OF COURT RECORDS AT A SUBSEQUENT TERM.—At a term subsequent to the finding of the indictment, the defendant was tried and convicted. Immediately after the trial, it was discovered that there was no entry in the minutes of the court, of the plea of "not guilty," made by the defendant at the prior term. The fact that such a plea had been made being shown by affidavits, and nothing appearing to show that it had not been made orally, in the usual manner, the court ordered that the records be amended to show such a plea. The judge making this order was not the judge who had presided at the prior term. *Held,* that the order was a proper one; that the fact of its being made by a different judge was immaterial; and that the court, nothing to the contrary appearing, was warranted in finding that the plea had been made in the usual and proper manner. *Held, also,* that a court has no power, at a subsequent term, to amend the record so that it will show something that did not occur at a prior term, but that it has full power to make the record conform to the truth, and to correct an error or omission of the clerk, when the mistake clearly appears.

NEW TRIAL—*Cumulative evidence.*—*Held,* in the case at bar, that the defendant did not exercise proper diligence as to the production at the trial of the evidence claimed to be newly discovered, and urged by him as a ground for a new trial, and that said evidence was cumulative in character and insufficient to justify a new trial.

SEPARATION OF JURY.—During the argument of the case, while the jury in charge of a bailiff were on their way to dinner, one of their number was compelled to detach himself and to hasten to a water-closet. He thereby became separated from his fellow jurors for about half an hour, but during the time was entirely alone, and conversed with no one. *Held,* on the authority of *Territory* v. *Hart,* 7 Mont. 489, that such a separation of the jury was not sufficient to justify a new trial.

VERDICT SUSTAINED.—*Held,* that the evidence in the case at bar was sufficient to justify the verdict of the jury.

*Appeal from the District Court, Silver Bow County.*

STATEMENT.

The defendant, Charles Clayton, was tried and convicted for the murder of Zodoc C. Maddox, in the District Court of Silver

Bow County, at the October term, 1887. The verdict of the jury was murder in the second degree, and the defendant was sentenced to imprisonment in the penitentiary for a term of fifteen years. He appealed from the judgment of the said court, and its order denying a motion for a new trial.

*Cole & Whitehill,* and *W. Y. Pemberton,* for Appellant.

The court erred in not sustaining defendant's challenge to the grand juror Joyce, on the ground that said juror was an alien, and also erred in not quashing the indictment on the ground that said juror Joyce acted as a grand juror in finding an indictment against the defendant, as well as did one Davis, who had never been served or summoned to act at the October term of said court. The said Joyce was not a competent grand juror, for the reason that he was an alien at the time he was impaneled, and heard the evidence in the jury room against the defendant. (Comp. Stats. p. 1008, § 1304, and p. 428, § 120; Bishop on Criminal Procedure, §§ 722, et seq. 749.)

Davis was not a competent grand juror, for the reason that he was never served, but that one John A. Davis was served to appear at the said October term, and, after being examined by the court, was excused from serving on the ground that he was a non-resident of the Territory. (Comp. Stats. p. 1008, § 1302.) The right of challenge is a substantial right. (*Territory* v. *Ingersoll,* 3 Mont. 454.) The court erred in allowing Marsh, a witness for the prosecution, and who was also a member of the grand jury, to testify as to what took place in the grand jury room. (Wharton on Evidence, § 549.) The court should have allowed the defendant, when testifying on his own behalf, to answer the following question: "What did you say when you delivered up this gun to Judge Smith?" This was a part of the *res gestœ,* and witnesses for the prosecution had been interrogated as to what had been done at that time and previous thereto. (Wharton's Criminal Evidence, § 262, et. seq.; *People* v. *Vernon,* 35 Cal. 49.) A trial in a criminal case without a plea is a nullity. (Wharton's Criminal Pleading, § 509; *People* v. *Gaines,* 52 Cal. 480; *People* v. *Gould,* 89 Ill. 216; *People* v. *Hoskins,* 84 Ill. 87; *Hicks* v. *State,* 111 Ind. 402; *Douglass* v. *State,* 3 Wis. 715.) The amendment of the record

and minutes at a subsequent term by a judge, who did not preside at the time the record was made, and by means of *aliunde* evidence, was illegal and did not cure the fatal defect. A court after a term has elapsed has no power to amend its record, except in the event of a clerical error or mistake, and this must appear from the record itself. (Bishop on Criminal Procedure, § 905, et seq.; *Comanche M. Co.* v. *Rumley,* 1 Mont. 201; *Swain* v. *Naglee,* 19 Cal. 127; *De Castro* v. *Richardson,* 25 Cal. 49; *McCarthy* v. *State,* 56 Miss. 294.) There is nothing, even in the affidavits and other *aliunde* proof offered, to show that the defendant ever made an oral plea of "not guilty," as provided by statute. Shanley's affidavit does not show it, nor does the memorandum taken from the calendar of Judge Galbraith, which by the way is neither a court record, nor a certificate of the judge, nor even an affidavit. (*Burney* v. *Boyett,* 1 How. [Miss.] 39; *Dickson* v. *Hoff,* 3 How. [Miss.] 165; also, 8 Smedes & M. 97, 318.) The newly discovered evidence of Price was a sufficient ground for a new trial. It was important for the defendant to prove any threats made by the deceased between the 8th of August, 1887, when the hay was cut, which was the cause of the difficulty, and the tenth day of August, the day of the killing. The defendant produced no evidence of this character at the trial, and did not know of such evidence until after the trial. (Wharton's Criminal Practice and Pleading, § 854, et seq.; also, § 868.) The affidavits on the part of the defendant show, that while the case was being argued, during a recess of the court, and when, under its instructions, the jury was placed in charge of an officer, there was a separation of one of the jurors from his fellows for at least one half hour. (Comp. Stats. § 354, p. 468; Wharton's Criminal Pleading and Practice, §§ 819–821; Bishop's Criminal Procedure, § 824; *McLean* v. *State,* 8 Mo. 154; *People* v. *Backus,* 5 Cal. 275; *People* v. *Brannigan,* 21 Cal. 338; *People* v. *Thornton,* 74 Cal. 482; *Organ* v. *State,* 26 Miss. 78.)

*W. E. Cullen,* Attorney-General, for Respondent.

At the time of inpaneling the grand jury, Joyce had taken out his first papers, i. e., declared his intention to become a citizen, and afterwards, and before the presentation of any indictment, he took out his second papers, and was made a full citizen

of the United States. (*Territory* v. *Harding*, 6 Mont. 326;
*Territory* v. *Hart*, 7 Mont. 42; S. C. 7 Mont. 489.) The juror
was naturalized before the finding of the indictment, and this
rendered him competent. (*Territory* v. *Hart*, 7 Mont. 489.)
In Michigan, a foreigner who has declared his intention to
become a citizen, and is thereby a qualified elector, is a compe-
tent juror. (*People* v. *Scott*, 56 Mich. 154; *People* v. *Rosevear*,
56 Mich. 158.) In Indiana, the presence of one alien on a
grand jury does not invalidate an indictment. (*State* v. *Taylor*,
8 Blatchf. 178.) The juror Davis was regularly drawn, but
was not summoned, and this is made ground of objection by
appellant. This is not a ground of challenge under our stat-
utes (Comp. Stats. div. 3, p. 427, §§ 119, 120), and if not a
ground for a challenge it cannot be urged. (*People* v. *Southwell*,
46 Cal. 143, 147, 151.) It might have been error for the court
to have completed the grand jury without having Davis brought
in, he having been regularly drawn to serve upon the jury, and
it not appearing that there were enough to complete the jury
without him. (*Osborne* v. *State*, 23 Tex. App. 431.) Error is
assigned in allowing grand juror Marsh to testify as to what took
place in the grand jury room. He was clearly competent. (See
Comp. Stats. div. 3, § 130.) If not competent, appellant's objec-
tion was not sufficiently specific to make his exception available.
(*Satterlee* v. *Bliss*, 36 Cal. 489, 511; *Cochran* v. *O'Keefe*, 34 Cal.
554, 558; *Hamilton* v. *South. Nev. G. & S. M. Co.* 33 Fed. Rep.
562, 567.) The declarations made by the defendant to Judge
Smith, at the time he delivered the gun, which he had taken
from the witness Powers, were no part of the *res gestæ*. The
true test of *res gestæ* is, are the declarations, the facts, talking
through the party, or the party talking about the facts. (Whar-
ton on Criminal Evidence, 691; *Greenfield* v. *People*, 85 N. Y.
78; *Hall* v. *State*, 48 Ga. 607.) The clerk of the court neg-
lected to enter the defendant's plea of not guilty in the minutes
of the court. Subsequently, and at another term of court, the
record was amended to conform with the facts. There was no
error in this. (*Territory* v. *Chrisiensen*, 31 N. W. Rep. 849, 850,
851; *Tryon* v. *Sutton*, 13 Cal. 491; *Bilanski* v. *State*, 3 Minn.
[Gil. ed. 313] 427; *Spanagel* v. *Dellinger*, 34 Cal. 476; *Frinck* v.
*Frinck*, 43 N. H. 508; 82 Am. Dec. 172; *Remick* v. *Butterfield*,

31 N. H. 70; 64 Am. Dec. 316; *Balch* v. *Shaw,* 7 Cush. 282; *Kelly* v. *U. S.* 27 Fed. Rep. 671; *Fay* v. *Wenzell,* 8 Cush. 317; *Lothrop* v. *Page,* 26 Me. 121; *Lewis* v. *Ross,* 37 Me. 234; 59 Am. Dec. 49; *Hunt* v. *Grant,* 19 Wend. 90; *Commonw.* v. *Hogan,* 113 Mass. 7.) It is immaterial that the judge presiding was not personally cognizant of the fact, that defendant had so pleaded. The newly discovered evidence of Price was not material. Uncommunicated threats of the deceased are not admissible; they must be proved to have been brought to the knowledge of the defendant, unless they are a part of the *res gestæ.* (*People* v. *Henderson,* 28 Cal. 466, 469; *People* v. *Lombard,* 17 Cal. 317; *State* v. *Harris,* 59 Mo. 550; *State* v. *Elkins,* 63 Mo. 159.) Other witnesses had testified to threats made by the deceased, and the evidence was cumulative. (Hayne on New Trial and Appeal, §§ 90, 91; *Garfield M. M. Co.* v. *Hammer,* 6 Mont. 53.) The newly discovered evidence must be such as to render a different result probable. (*Francisco* v. *Benepe,* 6 Mont. 243.) The question as to when a verdict should be set aside because of a separation of the jury was fully considered by this court in the case of the *Territory* v. *Hart,* 7 Mont. 489. This case is not materially different. It is affirmatively shown that there was not such misconduct on the part of the juror as to interfere with the fairness of the trial. (*State* v. *Harris,* 12 Nev. 421; *Territory* v. *Hexter,* 3 Mont. 206.)

BACH, J.—The defendant, Charles Clayton, was indicted by the grand jury of Silver Bow County, at the October term, 1887, of the District Court in and for the said county, for the offense of murder, alleged to have been committed on the tenth day of August, 1887, by the killing of one Zadoc C. Maddox. The trial took place at the May term, 1888, of said District Court, and defendant was found guilty of murder in the second degree, and sentenced to the territorial prison for a term of fifteen years. A motion for a new trial was made in the court below, which was denied, and this appeal was taken from the judgment and order denying said motion.

The errors complained of by the defendant are as follows:—

The court erred in not sustaining defendant's challenge to the grand juror, Charles M. Joyce, on the ground that said juror

was an alien; and also erred in not quashing the indictment, on the ground that said juror, C. M. Joyce, acted as a grand juror in finding an indictment against the defendant, as well as did one John E. Davis, who had never been served or summoned to act at the October term of said court. At the time of the impaneling of the grand jury, the defendant challenged the grand juror Joyce, on the ground that he was not a full citizen of the United States, he having stated that he was a foreigner, and had taken out his first papers only. The court refused the challenge, and the defendant excepted. Thereafter, as it appears from the bill of exception, the said Joyce was by the court admitted as a full citizen of the United States; which order was not made until after said Joyce had heard part of the testimony, but was made before the final consideration of the case by the grand jury, and the presentation of the indictment. It is declared by section 1304, page 1008, Compiled Statutes, that "any male person of lawful age who is a citizen of the United States, or has declared his intention to become such, . . . . shall be competent to serve as a grand or trial juror." Section 120, page 428, enumerates the causes for which a challenge may be interposed to any individual grand juror, and, among others, as follows, to wit: "*Second.* That he is an alien." These two sections seem to be almost irreconcilable, and it would seem to be the duty of the legislature to remedy the evil. In the case of *Territory* v. *Harding*, 6 Mont. 325, the court, by the former chief justice, evidently attempts to construe the sections together; and it was there intimated, if not directly decided, that a male person of lawful age was legally competent to serve as a grand juror, although not a full citizen, provided he had declared his intention to become such. But the question has never come directly before this court for adjudication. The case at bar comes directly under the rule stated in *Territory* v. *Hart*, 7 Mont. 489. The court says: "It, then, appears that at the time the jury retired to consider their verdict, and at the time the verdict was rendered, all the members of the jury were citizens of the United States; and the objection of alienage does not apply." In that case one of the petit jurors was made a full citizen during the progress of the trial. So, in this case, the grand juror Joyce was made a full citizen of the United States before

the vote was taken by the grand jury; therefore the indictment was found by a grand jury composed of sixteen citizens of the United States.

The motion to quash the indictment was based principally upon the ground that "two persons, not allowed by law, were permitted to be present during the session of the grand jury, while the charge embraced in the indictment was under consideration, to wit, C. M. Joyce and John E. Davis." The motion was simply a distinct and separate mode of raising the question of the qualification of those persons as grand jurors. We have held above that Joyce was a competent grand juror. It appears from the record that one John E. Davis was regularly drawn to serve as a grand juror at the October term, 1887, of the District Court of Silver Bow County, at which the indictment in this case was found. By some error or oversight, the sheriff did not serve John E. Davis, but did serve one John A. Davis, who appeared in court in obedience to the summons, and, showing that he was a citizen of the State of Illinois, was discharged. The return on the *venire* showing a service upon the above-named John E. Davis, the court issued an attachment for him; and, being brought into court, he was impaneled and served as a juror upon the grand jury which found this indictment. He was regularly drawn, but was not summoned, and this is made ground of objection by the appellant. If Davis was a grand juror, then the motion to quash the indictment, because of his presence at the meetings of the grand jury, was properly denied. It will be observed that Davis, as far as the record shows, had all the personal qualifications of a grand juror, and that no challenge could have been successfully urged against him upon any of the grounds which are enumerated in section 120 of the Criminal Practice Act, as causes for challenge to an individual grand juror. It is very doubtful if a challenge could have been sustained if made to the panel. The only ground for such a challenge is found in section 119 of the Criminal Practice Act, and is as follows: "The challenge to the panel may be for the cause that the same was not drawn in accordance with the essential provisions of the law of this Territory." The objection to the juror Davis was not that his name had not been drawn properly, but that he had not been properly summoned. It

would seem that the summoning of the individual grand juror is not cause for challenge under said section 119. However that may be, the record shows that the defendant and his counsel were present when the grand jury was impaneled; that an opportunity was given to the defendant to interpose any challenge which he might have either to the panel, or to the individual grand juror, and that he failed or neglected to exercise such challenge as far as the juror Davis was concerned. He must therefore be deemed to have waived such challenge. (*Territory v. Harding*, 6 Mont. 324.) Davis was sworn as a grand juror, and, no objection being made, he was to all intents and purposes a grand juror, properly qualified, properly drawn, and properly summoned. He was properly present at the meeting of the grand jury. The motion to dismiss was based upon other grounds, but they include no other cause than those already considered.

Benjamin Plummer was called as a witness for the prosecution. He was present at the time the shooting took place; and, considering the character of his testimony, the conclusion is inevitable that the prosecution called him as a witness, not from choice, but in order to comply with the rule laid down in *Territory v. Hanna*, 5 Mont. 248. If that case is to be construed as meaning that the *res gestæ* must be proved by each and every person present, and that the prosecution must call every such person as a witness for the Territory, and if the rule is not to be limited to the calling of witnesses sufficient in number to prove all of the facts, then it would seem that a more liberal rule should be allowed the Territory as to contradicting witnesses called for the prosecution. The reason given for the law which forbids a party contradicting a witness called by him is that he has voluntarily called such witness, and that he thereby guaranties his veracity. If the rule in the *Hanna Case* is to be extended to the limit indicated, it could scarcely be said that the Territory would be acting voluntarily in calling its witnesses. The witness Plummer testified, among other things, that, at the time of the shooting, deceased, who had driven up to the place where he met the defendant, jumped out of the wagon with his shotgun in his hand. The prosecution called Frank Marsh, one of the grand jurors, evidently for the purpose of contradicting

the witness Plummer in that regard, or, rather, to prove contra-
dictory statements made by him (Plummer) before the grand
jury.   It would seem that the best-considered authorities hold
that it is error to allow such testimony; those authorities hold-
ing that, where a party is taken by surprise by the testimony of
a witness, he may show the facts to be otherwise than as testi-
fied to by said witness; but that he cannot impeach the char-
acter of such witness, or prove by other witnesses contradictory
statements made by him out of court for the sole purpose of
contradiction.   (Wharton on Evidence, § 549, and cases cited.)
But Marsh did not contradict Plummer.   He testified that he
was the secretary of the grand jury; that he reduced to writing
the testimony which Plummer gave to that body; and that
Plummer gave no testimony whatever as to whether or not the
deceased had a gun in his hand when he got out of the wagon.
Marsh certainly did not prove any contradictory statement made
by Plummer.   If there was error in admitting the testimony, it
was in no way prejudicial to the rights of the defendant, and
did not work him any injury.

The shooting occurred at a place about two miles from the
town of Melrose.   The defendant was called as a witness in his
own behalf, and, among other things, testified that, after the
shooting occurred, he and others remained at the place for some
time; that defendant rode to the home of the deceased, and
notified the family of the shooting; that he then started for
Melrose to surrender himself to the sheriff; that he met Mr.
Justice Smith about one-half mile from Melrose, and that he
gave the shotgun to him.   The defendant's counsel then asked
the defendant, "What did you say when you delivered up this
gun to Judge Smith."   To this question the prosecution
objected, the objection was sustained, and the defendant
excepted to the ruling of the court.   Judge Smith had been
called as a witness to identify the gun referred to; and in his
testimony he confined himself strictly to that fact, and gave no
part of any conversation between himself and the defendant.
The testimony sought does not come within the rule which
allows a party to give any portion of a conversation already
introduced in evidence by the other side, whether or not such
conversation was properly introduced.   The defendant, how-

ever, claims that the question was proper, as calling for part of the *res gestœ.* It has been said that "*res gestœ* are events speaking for themselves, through the instinctive words and acts of participants; not the words and acts of participants when narrating the events. . . . . And as long as the transaction continues, so long do acts and deeds emanating from it become part of it, so that, describing it in a court of justice, they can be detailed. The question is, is the evidence offered that of events speaking through participants, or that of observers speaking about the event. . . . . Nor are there any limits of time within which the *res gestœ* can be arbitrarily confined." (Wharton on Criminal Evidence, § 262.) And again, it is said that "they must be necessary incidents of the litigated act; necessary in this sense, that they are part of the immediate concomitants or conditions of such act, and are not produced by the calculated policy of the actors." (Wharton on Criminal Evidence, § 263.) The same author, speaking of this subject, says: "It is not, however, necessary that such declarations, to be a part of the *res gestœ*, should be precisely concurrent with the act under trial. It is enough if they spring from it, and are made under circumstances that preclude the idea of design. The test is, were the declarations, the facts talking through the party, or the party's talk about the facts? . . . . So one indicted for murder cannot give in evidence his own conversations, had after going half a mile from the place of murder, when he has had time to collect himself, to make out his case." (Wharton on Criminal Evidence, § 691, and cases cited.) Another rule seems to be that the statement cannot be introduced in evidence when it is a narrative of past events. (Wharton on Criminal Evidence, § 264; *People* v. *Ehring*, 65 Cal. 135; *People* v. *Ah Lee*, 60 Cal. 85–91; 1 Greenleaf on Evidence, § 110.) Tested by these rules, it is evident that the statement made by the defendant to Judge Smith was not a part of the *res gestœ;* for it was not so closely connected with the act as to become an incident thereof, or to be "the facts talking" through the defendant. So much time had elapsed after the shooting took place that the defendant had had ample opportunity to form his design and plan of defense; the shooting was complete; provision had been made for the comfort of the victim; the defend-

ant had gone a mile and a half for the purpose of submitting to arrest; the event was passed; the tragedy had been acted; and defendant's statement was but his history of a deed that was already done and complete in all its parts.

The witness Power, called in behalf of the Territory, testified that, so far as he knew, the deceased did not have any pistol on him at the time of the shooting. He was then asked this question: "If he had had one, do you think you would have seen it?" The defendant objected to this question as irrelevant and immaterial, and his exception was noted to the ruling of the court admitting the question. It is urged that this calls for the opinion of the witness, and that it was a question which the jury should have decided. The answers are few which do not more or less contain the opinion of the witness; inferences drawn from facts known or thought by him to be known to him; the ultimate fact deduced from precedent facts known perhaps to no one save himself, and which cannot be described. And it is impossible to suppose that the jury could arrive at the ultimate fact sought by this question. Take the question of identity: The witness is asked if he saw the defendant, and answers that he did see him. Is that not the opinion of the witness, an inference drawn from facts known to him? Mr. Wharton in his work on Criminal Evidence, section 13, says: "But here comes another question of inference: Is the defendant the person by whom the shot was fired? . . . . Men's faces and figures, like their handwritings, may sometimes be so similar that the keenest observer is baffled when seeking to discover a difference. The witness is asked how he knows that the prisoner at the bar is the person who fired the fatal shot, and his answer is: 'I infer it from a similarity of eyes, of hair, of height, of manner, of expression, of dress.' Human identity, therefore, is an inference drawn from a series of facts, some of them veiled, it may be, in disguise, and all of them more or less varied by circumstances. Analyze the answer of the witness given in the foregoing quotation. Does it not call for the opinion of the witness? Are the eyes similar? Is not that an opinion of the witness? The similarity of the hair, of height, of manner, is that not the opinion of the witness? Certainly it is. It is an opinion formed without conscious mental process,

and based upon facts thoroughly and completely known to the witness, but so intangible, so delicate, so nice that the eye may catch them, but the tongue of man cannot describe them. Such ultimate facts, opinions formed, so to speak, unconsciously — at least through no conscious process of reasoning — are facts so far as the law of evidence is concerned." "Opinions, therefore, which are abbreviations of the facts, are admissible, when the facts, though not expressed, are implied." (See Wharton on Evidence, § 15.) And Mr. Wharton quotes from the famous logician, Mr. Mills, who says: "It is too much to say, 'I saw my brother.' All I positively know is that I saw some one who closely resembled my brother, as far as could be observed. It is by judgment only I can assert he was my brother." And yet who would object to the question, "Was the person whom you saw your brother?" or to the question, "You may state, if you know, who was the person whom you saw," — upon the ground that it called for the opinion of the witness. Take the question that preceded the one objected to, "Did Mr. Peterson have a pistol upon him at that time?" and the answer, "Not that I know of." Is not that the opinion of the witness, based upon his observation and means of observing? Is it not the judgment of the witness, based upon facts of which the witness was fully conscious, but which he could not describe? The time of day or night, the relative position of the two parties, the absence of intervening objects, these, to a certain extent, may be described; but who can describe to a jury the niceness of an examination, the strength of one's own eye-sight, and the many other surrounding circumstances peculiar to the particular transactions? (See, also, *Sloan* v. *Railroad Co.* 45 N. Y. 125.) The witness, and he alone, could answer the question objected to. Whether or not he was in such a position and under such conditions that would have enabled him to see the pistol, if there was any there, was a fact deducible from precedent facts, and to be deduced, by him alone, to the same degree as is the question of human identity.

Another alleged error is, that the record at the time of the trial did not show that the defendant had made any plea to the indictment. If such was the full history of the case, it would seem that the trial, verdict, and judgment are nullities. (See Wharton's

Criminal Pleading and Practice, § 409, and cases cited; *People* v. *Gaines*, 52 Cal. 480.) The transcript shows the following facts: The indictment was found at the October term, 1887, of the District Court, Mr. Justice Galbraith presiding. The cause was continued for that term. Trial was had at the June term, 1888, of said court, Mr. Justice De Wolfe presiding. Trial resulted in a verdict of guilty, and the judgment herein appealed from. Thereafter, and during the said June term, it was discovered that the record—the minutes of the court—contained no entry of the plea of the defendant, and a motion was made to correct the minutes of the October term by inserting therein the plea of the defendant that he was "not guilty." Said motion was based upon certain affidavits, among others the affidavit of the defendant himself, filed on a motion previously made in his behalf for a continuance, from which it appeared as matter of fact the defendant had pleaded "not guilty." It further appears from the transcript that the order was granted, the minutes were corrected, and show the plea of the defendant. To said order the defendant excepted. Had the court the right to amend the minutes at a subsequent term? There seems to be much conflict upon this question, and fine distinctions are drawn. From a careful inspection of the authorities, it would seem that the true rule is this. That the court may amend its records and alter its judgments to any extent during the term at which the records and judgments were made; but that at a subsequent term it can amend its records to such an extent only as will make the record show what actually did take place; but at such a time the minutes cannot be amended so as to recite a fact that never happened, to create a judgment never authorized by law, or, under the form of an amendment to a judgment, to exercise an appellate jurisdiction and reverse the judgment. In *Comanche. Mining Co.* v. *Rumley*, 1 Mont. 201, it was held that the court could amend the record, and that judgment could be entered at a subsequent term, where a verdict had been rendered by a jury, and the clerk had neglected to enter judgment; and it was also held that the court, at a subsequent term, could amend that judgment by inserting the names of persons which had been inadvertently omitted therefrom. In *Fredericks* v. *Davis*, 6 Mont. 460, an order or judgment of distribution was made in a

partition suit, and at a subsequent term the order was set aside.
This was held error; and the court quoted with approval from
Freeman on Judgments, section 101, as follows: "But neither
a final judgment nor final decree, pronounced upon a hearing
on the merits, can be set aside after the term, upon motion, for
any error into which the court may have fallen. The law does
not permit any judicial tribunal to exercise a revisory power over
its own adjudications after they have, in contemplation of the
law, passed out of the 'breasts of the judges.'" In the case of
*Comanche Mining Co.* v. *Rumley, supra,* the court ordered that
the record should show that to have been done which had actually
transpired. In the last case (*Fredericks* v. *Davis*) the court had
stricken from the record, and set aside an order duly entered,
and which had actually been made by the court, and in so doing
the court below usurped the powers of the Supreme Court. In
*Swain* v. *Naglee,* 19 Cal. 127, it was held that courts have power
to amend clerical errors, and enter a judgment *nunc pro tunc,*
when the record itself discloses the error, even though the term
has lapsed. The facts were these: The Supreme Court had
actually affirmed an order granting a new trial, whereas the
minutes of the court showed that the court affirmed the judg-
ment. This was clearly correcting a mistake, and allowing the
truth to be shown. In *Rousset* v. *Boyle,* 45 Cal. 64, it was held
that, "when the judgment entered by the clerk does not conform
to that pronounced by the court, it will be corrected, even after
appeal and affirmance of the judgment." And the same doc-
trine was approved in *Dreyfuss* v. *Tompkins,* 67 Cal. 339. In
*De Castro* v. *Richardson,* 25 Cal. 49, however, it was held
that the District Court had no power, at a subsequent term, to
amend its minutes as to the time allowed to defendant to file
a statement on motion for new trial. And the court uses this
significant language: "It is not stated in the motion, nor recited
in the amended order, that the court did, at the September term,
grant the defendants the thirty days in which to give the notice;
and there was nothing in the record at the September term show-
ing that the court did give, or intended to give, the defendants
the time for that purpose." This case was afterwards reversed
in *Spanagel* v. *Dellinger,* 34 Cal. 481. In *Rousset* v. *Boyle,*
*supra,* the court say: "Whatever conflict may be found (and it

is certainly far from inconsiderable) between the authorities as to the right and duty of the trial court to correct its records in order to make them conform to the truth, . . . . we think that it must be conceded, that under no system of jurisprudence, recognized among civilized people, has it ever been permitted that a party who has, by the mere misprision of the clerk, obtained against his adversary the entry of a judgment never, in fact, pronounced or rendered by the court, should, while substantially admitting the fact of the mistake, retain its fruit.    The cases out of which controversies upon the subject have arisen are cases in which the judgment had, in point of fact, been rendered by the error of the trial court, or in which the fact of the mistake or misprision of the clerk was controverted." In this last sentence is to be found, in our opinion, the true test as to whether or not the court can amend the record. In *Bank* v. *Moss*, 6 How. 31, it was held that the court, at a subsequent term, could not set aside a judgment because of error, because the proper remedy was by new trial, writ of error, or appeal; but the court say: "We are not to be misunderstood by this to deprive a court, at a subsequent term, of the power to set right mere forms in its judgments, or power to correct misprisions of its clerks. The right to correct mere clerical errors, so as to conform the record to the truth, always remains." In *Sheppard* v. *Wilson*, 6 How. 261, a motion in the court below had been made for a new trial, and, before decision thereon, the court adjourned. By some mistake an entry was made on the minutes that the motion was overruled. At the next term the court set aside the order, and ordered that an order of continuance, which had been made at the former term, but not entered in the minutes, should be entered *nunc pro tunc*, and finally decided the motion for a new trial. The distinction to be drawn between these two cases is the same as that existing between the two cases from the California Supreme Court, and as that existing between the cases found in our own reports. It would be almost impossible to refer to all the authorities on either side of this question; but we firmly believe that an examination of them will prove that the distinction to be drawn is this: That the court has not the power, at a subsequent term, to amend the record, in order that the record may show that which did not take

place, thus exercising a revisory or appellate power over its own decisions; but that the court always has the power to make the record speak the truth — power to correct the clerical mistake or omission of its clerk, when the mistake clearly appears. The latest case on this subject is that of *Territory* v. *Christensen*, 31 N. W. Rep. 847, from the Supreme Court of Dakota. In that case the District Court had, at a subsequent term, amended the record in matters closely analogous to the amendment made in this case. After a very elaborate and learned discussion by Mr. Chief Justice Tripp, it was held that the court below had the right to so amend the record. (See, also, *Bilansky* v. *State*, 3 Minn. [Gil. 313] 427; *Walker* v. *State*, 102 Ind. 502; *Kelly* v. *U. S.* 27 Fed. Rep. 616.) We cannot see that the rule should be changed in this case, because of the fact that the judge who allowed the amendment was not the judge who presided at the time the plea was made; for the fact of the plea is admitted, and the only question is one of jurisdiction.

It is urged that the court below had no power to make the amendment to read that the plea was made orally, as that did not appear from the affidavits. We are of the opinion that the fact of the plea is the essential, not its form; but we think that the court below was warranted in finding that, when the plea was made, it was made in the usual and proper manner, nothing to the contrary appearing.

A new trial is sought upon the ground of newly discovered evidence, concerning certain threats made by the deceased against the defendant in the presence of one John Price. In the affidavit of the defendant, made in support of the motion, he states that he had known, for a long time, that the deceased had made threats, that he had been unable to procure the evidence of any witness at the trial, and that he did not know that Price would swear to the threats referred to, until after the trial. Price was a witness for the prosecution, was cross-examined by the defendant's counsel, and in the latter examination the very conversation set out in the affidavit for continuance is referred to. We do not think that the record shows due diligence. Moreover, the evidence is cumulative. The witnesses Moore and Peterson, called by the defendant, testified as to threats made by the deceased against defendant.

A new trial is asked also upon the ground that the members of the jury were guilty of misconduct, in that they separated without leave of court. It appears from the record that, during the progress of the trial, the juror McGill was sick with diarrhœa, and was frequently called to the privy, but that up to the time when the case was finally given to the jury the bailiff always accompanied him. It further appears that the jury, after the case was closed, retired to their room, whence they were taken by the bailiff to dinner; that upon leaving the building the juror McGill was taken ill so suddenly that he was compelled to hasten to the privy, and that the bailiff was ahead of him with the other jurors, and consequently McGill could not delay in order to inform him; that McGill went directly to the privy, and, having attended to the call of nature, he returned to the jury-room; that he neither saw any one nor spoke to any one during the time he was alone; that he waited in the jury-room until the bailiff came and conducted him to the restaurant, at which the other jurors were procuring their dinner. It is not claimed that any person spoke to McGill, and the record discloses no fact tending to show any injury to the defendant. Upon the authority of the case of *Territory* v. *Hart,* 7 Mont. 489, such facts do not justify a new trial.

It is also claimed that the evidence does not justify the verdict. It appears from the evidence that on the tenth day of August, 1887, the deceased, and the witnesses Peterson and Power, were driving to some hay lands, part of the public domain; that on the way they met the defendant, and stopped; that the deceased and the defendant then had a quarrel about the right to cut the hay upon the land mentioned, each claiming the right to be his own; that defendant called to the deceased "to come on"; that deceased, during the quarrel, had a shotgun in his lap, but handed the gun to Powers, and then, upon the challenge "to come on," jumped out of the wagon, and exclaimed, "I am not armed; I haven't anything to defend myself with whatever;" that defendant took a few steps backward towards his mowing-machine, and procured a pistol; that deceased, when he jumped to the ground, had his back to the defendant, and was in the act of turning, and had turned about half way around, when the defendant fired three shots, two of which were described

as fatal wounds, and death resulted therefrom upon the afternoon of that day.   Testimony was also introduced to show that defendant had frequently threatened to take the life of the deceased, and that he had often said that, if the deceased tried to cut the hay upon the land, either he would kill Maddox, or Maddox would have to kill him.   Surely upon such testimony, the jury was warranted in finding a verdict of guilty of murder in the second degree.   It is true that the defendant and the witness Plummer contradict this testimony in part, they stating that the deceased had the shotgun in his hand, and that he was walking towards the defendant with the gun aimed at him, when the fatal shots were fired.   The jury believed the former, and not the latter, version; and we think properly so, for, unless the jury had refused to believe the testimony of the physician who made the *post mortem* examination, the stern logic of facts must have convinced them, that the deceased was not facing the defendant when the fatal shots were fired, because every shot that was discharged struck the deceased in the back. The defendant himself recognized that weakness; for he says in his testimony that the doctor must have been mistaken as to the position of the wounds.   The jury was fully and fairly instructed as to the law.   In fact the ability of his counsel warrants the belief, which the record sustains, that those instructions were all that defendant could claim.   We have carefully examined every alleged error which the ingenuity of counsel could discover, but we find no cause for reversing the judgment and order appealed from, and they are therefore affirmed.

*Judgment affirmed.*

McCONNELL, C. J., and LIDDELL, J., concur.